UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

MARTIN WALTER, ELIZABETH WALTER, )
GARY WICHROWSKI, JAN WICHROWSKI, )
d/b/a B&G PROPERTIES, )
                                )
         Plaintiffs, )
                                )         No. 3:15-CV-535-TAV-DCP
v. )
                                )
AUTO-OWNERS MUTUAL INSURANCE )
COMPANY, )
                                )
         Defendant. )

## <u>MEMORANDUM AND ORDER</u>

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court are Defendant's Motions in Limine to Exclude Plaintiffs' Experts, Todd Duncan [58], Charles Witt [60], Maurice Mallia and Mary French-Ewers [Doc. 62], and Greg Lampkin [Doc. 65]. The parties appeared before the Court on May 10, 2018, for a *Daubert* hearing. Attorneys Louis A. McElroy, II, and Archie Carpenter appeared on behalf of Plaintiffs. Attorneys Dean T. Howell and Howard E. Jarvis appeared on behalf of Defendant. No testimony from Plaintiffs' expert witnesses was presented. Accordingly, for the reasons more fully set forth below, the Court **DENIES** the Motions with respect to Todd Duncan [**Doc. 58**], Charles Witt [**Doc. 60**], and Greg Lampkin [**Doc. 65**] and **DENIES AS MOOT** Defendant's Motion [**Doc. 62**] with respect to Maurice Mallia and Mary French-Ewers.

## I.       BACKGROUND

This case concerns whether an explosion occurred in Plaintiffs' building on June 1, 2011, and whether Plaintiffs' building was damaged by the alleged explosion. [Doc. 40 at ¶ 7, Doc. 46

at ¶ 7]. Plaintiffs disclosed the following experts to testify at trial about the existence of an explosion, the structural damages caused by an explosion, and the estimation of costs to repair the damages caused by the explosion: Greg Lampkin ("Lampkin"); Todd Duncan ("Duncan"); Charles Witt ("Witt"); Maurice Mallia ("Mallia"); and Mary French-Ewers ("French-Ewers"). [Doc. 24] (Plaintiffs' Disclosure of Potential Expert Witnesses).[1] Defendant has challenged all of their opinions.[2]

The Court will first discuss the allegations in the Complaint and then turn to the expert witnesses' testimony.

### A. Factual History

Plaintiffs filed their Complaint [Doc. 1-2] on November 6, 2015, and subsequently, on December 13, 2017, filed a First Amended Complaint for Damages and Breach of Contract [Doc. 40] ("Amended Complaint").[3] In their Amended Complaint, Plaintiffs state that they collectively own a building located on 7620-22 Clinton Highway in Powell, Tennessee (hereinafter, "Building"). [*Id.* at ¶ 2]. Prior to June 1, 2011, Defendant issued an insurance policy to Plaintiffs, which protected the Building and its contents from the perils listed in the policy. [*Id.* at ¶ 6].

Plaintiffs allege that on June 1, 2011, a fire and explosion occurred in the Building, causing damages thereto and to the contents therein. [*Id.* at ¶ 7]. Plaintiffs continue that the damage was the type identified and covered under the policy Defendant issued. [*Id.*]. Plaintiffs state that they

---

[1] Plaintiffs also disclosed David Icove, Ph.D., a professional engineer who works with the Knox County Fire Investigation Unit. [Doc. 24]. It does not appear, however, that Plaintiffs will call Dr. Icove as a witness in this case.

[2] As discussed below, in response to Defendant's Motion to Exclude Mallia and French-Ewers, Plaintiffs stated that they no longer intend to rely on their testimony.

[3] The original Complaint was filed in the Circuit Court for Knox County, Tennessee, but was removed to this Court on December 4, 2015.

have timely performed all conditions precedent to recover under the policy and that they have made a full demand of their loss to Defendant. [*Id.* at ¶¶ 9-10]. Plaintiffs maintain that Defendant has not paid the full amount owed to them and that Defendant has breached the contract between the parties. [*Id.* at ¶¶ 10-11]. Plaintiffs seek monetary damages in an amount not to exceed the policy limits of $549,100.00. [*Id.* at 3].[4]

Defendant has raised challenges to Plaintiffs' expert witnesses. Specifically, Defendant challenges the opinion of Lampkin, a fire investigator for the Knox County Fire Investigation Unit ("KCFIU"),[5] who opines that a "low-order explosion" caused by the ignition of Coleman fuel occurred in Plaintiffs' Building. Defendant challenges Lampkin's methodology in arriving at his opinion and claims that Lampkin is not qualified to testify as to the cause of the alleged damage that he discovered in Plaintiffs' Building.

Next, Defendant challenges the opinion of Duncan, a professional engineer, who opines on the "structural damages caused by the fire and/or explosion in question at the scene of the loss." [Doc. 24]. Defendant argues that Duncan is not qualified to render an opinion about explosions, and it challenges Duncan's methodology in arriving at his conclusion.

With regard to Witt, a Tennessee licensed general contractor, Defendant maintains that his testimony regarding the costs to repair the damages should be excluded because he is not qualified to offer expert testimony regarding explosions and his methodology is unreliable. Defendant

---

[4] The Court observes that Plaintiffs' Amended Complaint states that they seek recovery from Defendant Charles Woods, who caused the fire and explosion in the Building. [Doc. 40 at ¶¶ 8, 12]. Charles Woods, however, was dismissed on November 8, 2016, pursuant to Federal Rule of Civil Procedure 41(b). [Doc. 7].

[5] KCFIU is a specialized unit of the Knox County Sheriff's Office.

explains that any admissible foundation for his conclusions is based on Duncan's opinion, which is unreliable.

Finally, Defendant challenges the testimony of Mallia, a structural engineer, and French-Ewers, an engineer in training. Defendant argues that their testimony concerning the possibility that the fire incident caused structural movement should be excluded for several reasons. Specifically, Defendant asserts that Mallia and French-Ewer's methodology is not reliable and that they are not qualified to offer their opinions. Plaintiffs have advised the Court that they will not be calling Mallia and French-Ewers to testify, but Defendant argues that they should still be deemed unqualified to testify by order of the Court.

The Court will now turn to the testimony of each challenged expert witness.

**B.     Testimony of Gregory Lampkin**

Lampkin is a fire investigator for the KCFIU, where he has been employed for approximately twenty-four (24) years. [Doc. 65-1 at 9]. Lampkin is certified through the National Association of Fire Investigators as a Certified Fire and Explosion Investigator and through the International Association of Arson Investigators as a Certified Fire Investigator. [*Id.* at 12]. His work entails, among other things, responding to fires and conducting investigations into their origin and cause. [*Id.* at 9]. He explained that during his training, he experienced two low-order explosions caused by Coleman fuel. [*Id.* at 68].

In his deposition, Lampkin testified that he arrived on the scene immediately after he learned about the fire, which was not long after the fire department arrived. [*Id.* at 13]. At the scene, he interviewed several people, took photographs, talked to the firefighters, and began looking at the Building. [*Id.*]. Lampkin testified that the fire damage was in the rear portion of the downstairs but that there was smoke damage throughout the whole Building. [*Id.*]. Lampkin

stated that he discussed the Building's pre-fire condition with Charles Woods ("Woods"),[6] Plaintiff Martin Walter, and David Phelps ("Phelps"), the maintenance worker. [*Id.* at 16]. Lampkin was the lead investigator of this matter until the case was reopened. [*Id.* at 21].[7]

Lampkin testified that in his opinion, a low-order explosion occurred when Coleman fuel was ignited in the basement of Plaintiffs' Building. [*Id.* at 8]. Lampkin stated that there was evidence at the scene that immediately drew his interest to a low-order explosion but that he confirmed his thoughts with David Icove, Ph.D., a KCFIU investigator and professional engineer, ("Dr. Icove") and Dennis Kennamer ("Kennamer"), a fire investigator with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). [*Id.* at 16-17]. Lampkin testified that he does not know the pressure that was generated by the low-order explosion but that Dr. Icove took steps to determine the speed of the low-order explosion. [*Id.* at 17].

Lampkin testified that the definition of "low-order damage" is explained in the Summary Expert Report by the Knox County Sheriff's Office's Fire Investigative Unit on the June 1, 2011 Fire and Explosion at 7622 Clinton Highway, Knoxville, Knox County, Tennessee ("Summary Report").[8] [*Id.* at 18]. Lampkin stated that the Summary Report references 921 of NFPA in

---

[6] *See infra* note 4.

[7] The Court understands that the fire incident that occurred in the Building was subject to a criminal investigation. It appears that the criminal case was reopened in 2014 when Woods, the individual charged with arson, agreed to be debriefed with respect to the incident. [Doc. 65-1 at 92]. Officials believed Woods's debriefing would uncover new information. [*Id.*].

[8] The Summary Report was identified as Exhibit 4 to Lampkin's Deposition [Doc. 65-1 at 26-28] and submitted as part of Plaintiffs' Supplemental Response to the *Daubert* Motion regarding Lampkin to further detail his qualifications and the methodology he used in the investigation [Doc. 74]. Defendant argues in its Reply Memorandum [Doc. 78], without citing supporting authority, that Plaintiffs' experts should not be permitted to rely upon the Summary Report and that the Summary Report should not be considered by the Court in reviewing any of the *Daubert* Motions because Dr. Icove has not been deposed concerning the Summary Report

defining "low-order damage" as "a slow rate of pressure rise or low-force explosion"[9] and explained that the Summary Report used the word "explosion" to describe low-order damage. [*Id.*]. Based on his experience, Lampkin determined that the fire ignition and the low-order explosion occurred simultaneously. [*Id.*]. He testified that there was only a single ignition and while the exact point could not be identified, it was determined that the fire was ignited in the basement area. [*Id.* at 18-19]. Lampkin further explained that the Coleman fuel vapors ignited or exploded and that in his opinion, there was "one fire ignited that most likely caused this low-order damage and the fire to begin." [*Id.*]. When questioned about calculations of the fuel-to-air ratio, the turbulence effects, or the vapor density of the Coleman fuel, Lampkin stated that he did not perform calculations. [*Id.* at 19]. He testified, however, that Dr. Icove did some calculations and that the vapor density calculations are contained in a written document—The Coleman Fuel MSDS. [*Id.*]. The vapor density calculations are also included in the Summary Report. [Doc. 74-1 at 19].

Lampkin was questioned about his conclusion contained in a report that he authored, Prosecutive Report, which states, "Evidence of a low-order explosion consistent with a fuel/air explosion were visible at the scene." [Doc. 65-1 at 27].[10] Lampkin explained that a "fuel/air explosion" means a mixture between fuel—that is, Coleman fuel vapors—and ambient air. [*Id.* at 27-28]. Lampkin continued that in a low-order explosion, the pressure moves slowly and affects

---

[Doc. 78 at 9]. While Defendants may wish to challenge the admissibility of the Summary Report through a motion in limine or objection at trial, there is no basis upon which to exclude its consideration for the purposes submitted, i.e., Lampkin's qualifications and methodology.

[9] "NFPA" stands for the National Fire Protection Association. NFPA published 921, which is the "Guide for Fire and Explosion Investigations." [Doc. 65-2].

[10] The Prosecutive Report was marked as Exhibit 8 to Lampkin's deposition, [Doc. 65-1 at 25], but was not submitted to the Court for review.

the weakest parts of a building. [*Id.* at 29-30]. Lampkin described signs of low-order damage he identified in the Building, including (1) the lower garage door was buckled outward; (2) at least three, if not more, support poles that held the floor system were dislodged; (3) a pole had lifted up and had a piece of felt paper under it; (4) a wall downstairs had been dislodged out of place; (5) the corner of a large glass window had been dislodged; and (6) a piece of clothing from the inside was pinched in between the wall. [*Id.*]. Lampkin testified that his knowledge of Coleman fuel and its property and tendency to cause low-order damage when ignited led him to believe that there was low-order damage in the Building. [*Id.*]. He did not, however, calculate the pressure or force required to displace the above structures. [*Id.* at 22].

Lampkin explained that in a low-order explosion, the force operates in a 360-degree direction. [*Id.*]. He stated that force would operate equally against all points of the 2 x 4 wall, the garage door, and the upstairs window. [*Id.* at 23]. He testified that although the force would operate on the container, no force would be exerted on any of the light items in the garage area because those items would not contain the actual force in a pressurized atmosphere. [*Id.*]. With respect to the basement, Lampkin testified that the containing structures include the exterior walls on the floor and the ceiling. [*Id.* at 24]. Lampkin stated that the 2 x 4 wall was originally a container but that "it gave," explaining that he observed a clean area on the concrete where the 2 x 4 wall appeared to have been. [*Id.*]. He continued that he is not sure if the wall had moved before the fire but that Plaintiff Martin Walters and Phelps said that it had not. [*Id.*].

Turning to the garage door, Lampkin testified that the outward buckling of the door indicated the effect of a low-order explosion. While acknowledging that it was possible that the buckle could have resulted from someone pushing the garage door out from the inside or battering on it to push it out, [*id.*], Lampkin maintained that the garage door was bulged out as a result of

the low-order explosion because it was the weakest link in the containing structure of the basement. [*Id.* at 23]. When asked why the explosion damaged the garage door but not other doors that were closer to the fire, Lampkin explained:

> I attribute that to the fact that those doors open inward, which is the strongest way you're pushing. You're not pushing against the door lock, you're pushing against the entire door frame, which means most likely you would have had to have either bend the door or dislodge the entire frame out of the concrete block as opposed to a garage door with a broken hinge that was obviously weaker. I don't remember what those doors, exterior doors, if they were wood or metal.

[*Id.* at 37]. Lampkin continued that the damage was consistent with blast overpressure and wave, meaning a low-order explosion. [*Id.* at 38].

In reference to the dislodged poles, Lampkin was asked whether he attempted to rule out other causes of their displacement. Lampkin testified that he did not but that by his visual inspection, he did not believe the displacement was caused by settlement. [*Id.*]. He explained, "The weight of the floor is going to be constant, so I don't know, it couldn't have moved the pole into a different place. The poles weren't loose, I'm sure we shook them, so I guess that's something I did to check that. The poles were tight when you shook them with your hand." [*Id.*]. Lampkin stated that the explosion generated enough force to lift the ceiling of the basement. [*Id.* at 39].

Lampkin further testified that the explosion started off as equal in all directions, but as the explosion met obstacles, the forces changed. [*Id.* at 63]. The equal force radiated from the epicenter outward in all directions in a sphere. [*Id.*]. Lampkin stated that he did not calculate the kinetic energy that impacted the wall or the basement ceiling. [*Id.* at 65]. He further stated that he did not calculate the pressure and that he did not know the amount of force that caused the damages to the 2 x 4 wall or the front door frame. [*Id.* at 73, 74, 76]. Lampkin testified that he

did not believe it was necessary to know the amount of force generated by the explosion in order to determine that an explosion occurred because he could look at the end result, [*id.* at 78], and maintained that NFPA 921 supports his conclusion that a low-order explosion occurred in the Building. [*Id.* at 68].

Lampkin pointed out that the front door frame was bent, which is "very indicative of a blast low-order damage." [*Id.* at 75]. He stated that he observed the damage to the garage door and that the damage was consistent with pressure that had been redirected. [*Id.* at 69]. He explained that most likely, the pressure was redirected by the 2 x 4 wall and traveled to the garage door, which caused the garage door to bend on the other side of the epicenter. [*Id.* at 69-70]. When Lampkin was asked whether the absence of evidence that the force affected lighter items suggests that the force did not enter the garage, Lampkin responded, "No . . . [b]ecause I don't think the force was great enough to move those. The force is attacking the containing vessel, which is the [B]uilding, not the stuff in it." [*Id.* at 73].

When asked about the amount of force required to dislodge the window frame, Lampkin testified that he did not calculate any forces, but he considered the fact that the window was dislodged but not broken. [*Id.* at 83]. He explained that "[NFPA] 921 actually states that it will dislodge windows but not break them." [*Id.*]. He continued that he did not conduct any experiments to test his hypothesis that the damage was the result of a low-order explosion but that he discussed with others at the scene what could cause such damage and that he relied on NFPA 921 in determining that it was a low-order explosion. [*Id.* at 84].[11]

---

[11] Lampkin also testified that the term "low-order explosion" was used in an earlier version of NFPA 921, but he does not believe the term is in the current edition. [Doc. 65-1 at 84].

Lampkin stated that as part of the scientific method investigating fires, he is required to test his hypothesis. [*Id.* at 85].[12] Because it is standard to do so, he believed alternative hypotheses were developed, but at the time of his deposition, he could not recall the alternative hypotheses in this matter. [*Id.*]. Lampkin clarified that he did consider another cause of the damage to the front door and to the garage door. [*Id.*]. He continued in his testimony that the blast pressure wave damaged the container but did not dislodge lighter items, which is consistent with NFPA 921. [*Id.* at 87]. He explained, "[M]ost of the damage will occur at the vent where the gas is escaping. It will not necessarily affect the stuff inside as bad as it will on the vessel walls, container, and the vent." [*Id.*].

Finally, Lampkin was asked about what steps he took to verify the condition of the Building before the fire. Lampkin testified that he would have read inspection reports and walked through the Building with the occupants to ask questions about the Building's prior condition as that was standard practice. [*Id.* at 91].

## C.        Testimony of Todd Duncan

Duncan is a professional engineer. [Doc. 58-7 at 1]. He currently serves as the president of Structural Engineering Assessments, PC, ("SEA") and has been with the company since August 1989. [*Id.*]. His work with SEA, includes forensic review and analysis of structures experiencing failures or collapse, as well as performing evaluations of existing structures in residential, commercial, and industrial buildings to determine the condition thereof for potential buyers and sellers. [*Id.*].

---

[12] The Court observes that the question was specific to investigating fires, but Lampkin's testimony related to alternative hypotheses for the damages he observed. [Doc. 65-1 at 85]. Earlier in his deposition, Lampkin testified that he could not recall the alternative hypotheses that he developed with respect to the causation of the fire. [*Id.* at 9]. He later testified regarding his alternative hypothesis for the damages in the basement. [*Id.* at 85].

In his expert report, Duncan concludes that the "damage and movement of the structures are consistent with the pressure caused by an explosion within the structure, as well as the conclusion of the Knox County Sheriff's Department of evidence of a low-order explosion." [Doc. 58-2 at 8]. Throughout his report, Duncan explains why the opinions of John Rast ("Rast"), Defendant's expert, are not supported by the physical evidence. For example, with respect to Rast's theory that varying soil bearing conditions and moisture caused differential settlement between the columns, Duncan states this theory is inconsistent with his (Duncan's) elevation survey, which indicated little or no differential settlement. [*Id.* at 2.]. Duncan submits that the physical evidence of the columns is consistent with the floor system being lifted off the columns. [*Id.* at 2-3]. Further, Duncan explains that Rast addressed the outward displacement of the south exterior wall and concluded that the crack pattern indicated differential settlement. [*Id.* at 4]. Duncan concludes that Rast's opinion is incorrect because the horizontal mortar joints were still aligned across the crack. [*Id.*].

In addition, Duncan calculated the pressure required to move or collapse the walls and the ceiling. [*Id.* at 3]. Duncan ultimately concludes as follows:

> Interfire states, "Low[-]order explosion describes an explosion event where the blast pressure front moves slowly, displacing or heaving (rather than shattering) objects in its path." For the purposes of description and investigation, NFPA 921 seems to prefer to characterize the damage caused by an explosion to a structure, rather than characterizing the explosion. Low-order damage as described by NFPA 921 states, "Low-order damage is characterized by walls bulged out or laid down, virtually intact, next to the structure. Roofs may be lifted slightly and returned to their approximate original position. Windows may be dislodged, sometimes without glass being broken. Debris produced is generally large and is moved short distances. Low-order damage is produced when the blast load is sufficient to fail structural connections of large surfaces, such as walls or roof, but insufficient to break up larger surfaces and accelerate debris to significant velocities." NFPA also states, "Relatively slow rates of pressure rise

will produce the pushing or bulging type of damage effects seen in low-order damage. The weaker parts of the confining structure or vessel, such as windows or structural seams, will rupture first; thereby[,] venting the blast pressure wave and reducing the total damage effects of the explosion."

Based upon the observed damage and movement in the noted items, the majority of the pressure from the explosion was contained in the large space of the lower (basement) level, in the area between the east side of the interior wood stud partition wall and the east exterior wall. The pressure resulted in the lifting of the main level floor framing system, which pushed the roof framing system upward. Simultaneous with the movement of the floor and roof systems, the south exterior wall bulged toward the south providing a large opening, which allowed the pressure force from the explosion to reach into the space of the main floor level, forcing the loose mortar debris . . . onto the main floor, as well as, venting to decrease the magnitude of the pressure as it diluted in the additional movement of space. As the floor and roof systems returned to their approximate pre-explosion position, a second pressure was generated by the descent of the roof (similar to the pressure created when the center pole is removed from a tent). The second pressure, combined with the diluted pressure from the explosion that remained in the main level floor space, was sufficient enough to push the base of the metal storefront frame toward the west, which provided a release for the pressure. The poor condition of the existing roofing was exacerbated during the lift and drop of the roof framing system, which resulted in the current leaks. While the observed conditions were found to match several of the NFPA conditions characterizing "low-order damage," the disconnected components of the referenced building needed less pressure from the explosion to result in the noted structural damage.

[*Id.* at 8]. Based on his inspection, Duncan recommends four general structural repairs. [*Id.* at 7].

During his deposition, Duncan testified that he was not asked to make a determination as to whether an explosion occurred in the Building and that he will not be offering any opinion regarding whether an explosion occurred in the Building. [Doc. 58-1 at 5]. He stated that he will offer testimony as to whether there is evidence that is consistent with an explosion. [*Id.*]. He testified that he does not consider himself to be an expert in explosions. [*Id.*]. He explained that his work at SEA involves conducting forensic investigations on damaged structures. [*Id.* at 6]. He

also designs structures and oversees the construction process during the installation of building structures. [*Id.*]. When asked whether any part of his work involves determining whether explosions occurred, he responded, "Just in the sense of looking for evidence that is consistent with an explosion." [*Id.*].

Duncan's consultation work includes assessing catastrophic structural damage from EF4 tornadoes, blasting and explosions, and impact damage from automobiles and trains. [*Id.*]. Duncan explained that when he does consultations, he determines what damage was caused after there has been a tornado, explosion, or impact damage. [*Id.*]. Duncan testified that he has never been involved in a case wherein he was asked to determine whether an explosion occurred and that he has never published literature on explosions or fire investigations. [*Id.* at 7].

Duncan testified that he inspected the Building to look for evidence of damage and to determine if the damage was consistent with an explosion. [*Id.* at 8]. Duncan photographed the damage to the steel flanges, and he determined the pressure that would be required to lift the floor up over the flanges, which is approximately 21.3 pounds per square foot ("psf"). [*Id.* at 9-10]. Duncan stated that he did not determine the amount of pressure or force generated by the explosion in the Building. [*Id.* at 10].

Duncan stated that he reviewed photographs of the Building that were taken before the fire and provided by Defendant's experts and the Sheriff's Department. [*Id.*]. He did not review any photographs of the basement's condition that were taken before the fire. [*Id.*]. Duncan testified that he disagreed with Rast's conclusion that the Building had settled. [*Id.* at 12]. Duncan explained that there was no evidence of settlement and that the base plates were within a quarter of an inch of each other, which is considered well below the tolerance level allowed for construction. [*Id.*]. Duncan further explained that he saw a melted piece of plastic sheeting that

was caught between the cap plate and the bottom of the wood beam, which is indicative of the floor structure being lifted above the cap plate. [*Id.* at 12-13].

When asked about whether he was offering some type of explosion as the explanation for certain conditions he observed in the basement, Duncan replied that there was pressure in the basement. [*Id.* at 13]. He calculated what the pressure needed to be to displace structures, but he does not know the amount of pressure generated by the explosion. [*Id.*]. He stated that based upon the evidence that he found, it appeared that the floor lifted and pulled the 2 x 4 wall slightly up off of the floor so that when the pressure made contact with the 2 x 4 wall, it was able to push it west. [*Id.* at 16]. He explained that he was not sure if pressure would act equally along the entire part of the ceiling because pressure starts reacting against itself when it reaches corners. [*Id.* at 17].

Duncan testified that he is not sure how much pressure reached the western wall or the garage area. [*Id.* at 18]. He stated that the pressure caused movement of the south wall and that 7.9 psf of pressure would be required to cause the movement. [*Id.* at 19]. He also found a crack at the southeast corner of the south wall. [*Id.* at 20]. He continued that when the pressure was generated, it was placed against the lower portion of the wall but not the portion above the main floor. [*Id.*]. He continued that as the main floor system elevated at the same time the pressure was against the wall, the wall pushed out to deflect towards the south. [*Id.*]. He stated that there was also separation of the wood framing from the masonry wall sections that showed movement toward the south. [*Id.*]. In order to confirm his theory one hundred percent regarding movement of the south wall, Duncan testified that he would have to know the amount of pressure that was generated. [*Id.* at 21].

Duncan testified that he discounted lateral movement due to settlement when he conducted an elevation survey of the floor system and found that it was fairly level along the wall. [*Id.*]. He

stated that there was insufficient variation to be indicative of settlement of the south wall. [*Id.* at 22]. When asked whether he took any steps to determine the Building's condition prior to the fire, Duncan responded:

> A. I always look at the whole building to see if there is any—any signs of previous movement that would indicate any kind of lateral loading displacement.
>
> I know Mr. Rast has theorized that the subfloor has expanded out to push that wall out, but that doesn't hold water because it's—the way that the subfloor framing is put in, it's at a 45-degree angle. So I didn't see any—I've not seen any evidence that would show any prior cause to move that outside wall.
>
> . . . [T]he charts that [Rast] puts in his report talks about the expansion of the wood with the different relative humilities. And the – first off, I was out there in the summer so the relative humidity would have been at its highest point, and I didn't see any signs of moving or pushing.
>
> Having it at a 45-degree angle then takes the movement from pushing directly against the south wall, but pushing it at an angle, so you've knocked 30% of that movement off of that expansion just because of the placement of the studs – or the planks.

[*Id.* at 23-24].

Duncan testified that the pressure generated from the event pushed against the ceiling of the basement (or the floor of the main level), which then pushed the roof of the Building. [*Id.* at 25]. The pressure also pushed against the south wall, allowing pressure to vent into the upstairs. [*Id.*]. Further, Duncan stated that the pressure generated by the downward force of the roof was sufficient to push out the base of the metal storefront. [*Id.* at 26]. He testified that the pressure indirectly affected the roof flashing when the floor caused the roof to raise, causing the flashing to pull loose. [*Id.* at 30].

When asked whether he could cite to any scientific or engineering literature that supports his testimony (i.e., that an explosion event occurring in the basement of the Building could raise

the floor above it, which would then raise the ceiling), Duncan replied, "Just experience." [*Id.* at 27]. He stated that he has not published any literature. [*Id.*]. He further testified that he considered alternative hypotheses for the damage he discovered. [*Id.* at 34]. Specifically, Duncan testified:

> I went in looking for as many possible options as I could. That's the way I investigate all my structures. If somebody says they've got wind damage, I go in looking for wind damage, I go in looking for settlement. I go in looking for lateral pressure. I try to make sure I cover all the bases so that I tell them how to fix their buildings like they need to be fixed.
>
> So, yes, I considered as many possibilities that I could think of.

[*Id.*].

### D. Testimony of Charles Witt

Witt is a licensed contractor in Tennessee. [Doc. 60-2 at 1]. He has had his contractor's license since 1992. [*Id.*]. He is the owner of TCS of Tennessee, Inc. [Doc. 60-1 at 3]. The majority of his work over the past twenty-two (22) years has consisted of repairing and renovating existing commercial construction. [Doc. 60-2 at 1]. In addition, he investigates and provides repair estimates for property owners and insurance companies. [*Id.* at 2].

With respect to his opinion in this case, Witt opines as follows:

> Based upon the scope of work defined by Todd Duncan, my visits to the scene of the accident and measurements regarding the scope of work, it is my opinion that a reasonable degree of certainty within the construction industry that the cost of repairs for the recommended work is $300,991.91. The breakdown of the work is computed in Xactimate estimate attached hereto as Exhibit 1.

[*Id.*].[13]

---

[13] During his deposition, Witt testified that Xactimate is a computer-generated estimating program used by the insurance industry. [Doc. 60-1 at 10].

During his deposition, Witt testified that he visited the Building two times prior to providing the costs for repairs. [Doc. 60-1 at 8]. He stated that he does not remember the exact dates that he visited, but his visits were within a couple of weeks from the date of his report. [*Id.*].[14] He continued that the first time he visited the Building, he and his partner, Reggie Bazel, reviewed Duncan's expert report with Duncan. [*Id.*]. Witt then returned to the Building to "scope[] the damages." [*Id.*]. Witt explained that when he "scoped the damages," he visited the Building and, following the guidelines of Duncan's report, determined what needed to occur to make the repairs. [*Id.*]. He stated that on his first visit to the Building, he stayed a couple of hours, and on the second visit, he was "there the better part of a day." [*Id.* at 8-9].

During one of his inspections of the Building, Witt took measurements of what needed to be torn out, replaced, and repaired. [*Id.* at 9]. Witt testified that he did not discuss the Building's condition before the fire with anyone. [*Id.*]. In addition, Witt stated that he did not review any photographs of the Building taken before June 1, 2011. [*Id.*]. Witt stated that his estimate regarding the cost of repairs is based on Duncan's report. [*Id.*]. He also inspected the Building in 2014 and developed an estimate for the work that needed to be done. [*Id.*]. Witt stated that his estimate is based on the condition of the Building as he found it in 2014. [*Id.*].

In making his estimate, Witt assumed that Duncan's recommendations were an accurate assessment of the damage caused to the Building solely from the explosion. [*Id.* at 10]. He further assumed that Duncan's recommendations were accurate as to the extent of the work. [*Id.*].[15] Witt testified that he reviewed the recommendations in Duncan's report (A, B, C, and D), visited the

---

[14] Witt's report is dated October 17, 2014. [Doc. 60-2].

[15] As mentioned above, Duncan recommends four general structural repairs, which are labeled as "A, B, C, and D" in his report. [Doc. 58-2 at 7].

Building to scope the damages and to obtain measurements, and then imputed the information into the Xactimate system to provide an estimate of the costs of repairs. [*Id.* at 14].

Witt testified that his estimate does not account for whether the Building was constructed properly when it was built, any previous damage to the Building, the previous construction of the Building, or any previous settlement of the Building. [*Id.*].

**E.** **Testimony of Mallia and French-Ewers**

Mallia and French-Ewers submitted a report dated October 11, 2011, at the request of TIS Insurance Services. [Doc. 62-3]. In their report, they explain that the scope of their inspection was to determine if the structural damage to the Building could have been related to the fire. [*Id.* at 1]. They explained that their report is solely based on visual observations at the site and that no destructive or material testing was performed. [*Id.*]. They conclude as follows:

> Without knowing how much pressure was produced by a fire, explosion, or the ignition of an accelerant, it is impossible to say whether or not the fire incident caused the movement. However, calculation[s] were performed in order to determine the amount of pressure it would take to move the stud wall, fail the 12" CMU wall, and lift the floor and roof framing. Based on the friction between the wood and the concrete, a pressure of 6.2 psf is needed to move the base of the stud partition wall. Since the wall was moved about 18", a pressure greater than 6.2 psf would have been required. In order to fail the grout and move the 12" CMU wall, a pressure of 11.24 psf would be required. And, a pressure of about 30-35 psf would be required to lift the floor and roof framing (an estimate weight of the dead load) to cause the movement seen around the girder saddles or the post caps on the upper level. If the previously mentioned pressures are reasonable during the fire incident (whether it be explosion or ignition of an accelerant), then it is possible that the fire incident could have caused the movement mentioned in this report. It does not appear that the observed movements are caused by failure of the foundation or external loads such as wind and seismic events.

[*Id.* at 5].

Defendant deposed Mallia on July 30, 2014, and deposed French-Ewers on July 31, 2014. Although the Court has reviewed their deposition testimony, [Docs. 62-1, 62-2], the Court will not summarize their depositions because Plaintiffs have represented to the Court that they are not calling either expert as a witness in this case.

## II.    STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable."  *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 589 (1993)). Specifically, Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert,* the Supreme Court of the United States stated that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. at 589.  The *Daubert* standard "attempts to strike a balance between a liberal admissibility standard for relevant

evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009).

The factors relevant in evaluating the reliability of the testimony, include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970-71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94). Rule 702 inquiry as "a flexible one," and the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138-39 (citing *Daubert*, 509 U.S. at 593); *see also Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cty., Tenn.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138-39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey*, 187 F. Supp. 2d at 70-71 (quoting *Daubert*, 509 U.S. at 593-94). The party offering the expert has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10.

Moreover, the Supreme Court has explained that in determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue." *Id.* at 592–93. "Furthermore, the court

must examine the expert's conclusions in order to determine whether they can reliably follow from the facts known to the expert and the methodology used." *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *7 (E.D. Pa. Feb. 1, 2001) (citing *Heller,* 167 F.3d at 153).

Further, a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." *In re Diet Drugs*, 2001 WL 454586, at *7 (quoting 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000)). This simply means that "a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *Id.* (other citations omitted).

Finally, "the court will not exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). Exclusion is the exception, not the rule, and "the gatekeeping function established by *Daubert* was never 'intended to serve as a replacement for the adversary system.'" *Daniels v. Erie Ins. Group*, 291 F. Supp. 3d 835, 840 (M.D. Tenn. Dec. 4, 2017) (quoting *Rose v. Matrixx Initiatives, Inc.*, No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. March 31, 2009)) (other quotations omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. Rule 702 does not "require anything approaching absolute certainty." *Daniels*, 291 F. Supp. 3d at 840 (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010)).

## III.    ANALYSIS

Guided by the foregoing, the Court will consider Defendant's Motions in Limine. Defendant raises various claims with regard to each expert, and these will be addressed in turn as to each expert.

## A.      Gregory Lampkin

Lampkin opines that there was evidence at the scene of the fire that a low-order explosion occurred in Plaintiffs' Building, causing low-order damage.[16]  Defendant challenges Lampkin's qualifications to render his opinion and his methodology.  The Court will begin with Lampkin's qualifications and then turn to his methodology.

### 1.      Qualifications

Defendant does not appear to challenge Lampkin's qualifications as an expert in fire and explosion investigations.  Instead, Defendant asserts that he is not qualified to render an opinion with respect to the cause of damages to the Building because he is not an engineer.  In addition, Defendant asserts that Lampkin was not designated as an expert witness to testify as to whether an explosion caused any damages to the Building and he did not provide a written report in compliance with Federal Rule of Civil Procedure 26(a)(2)(B).

Plaintiffs assert that Lampkin is highly qualified to render his opinions in this case. Plaintiffs state that Lampkin is an experienced investigator of not only fires, but also explosions. They note that he is a member of several fire and explosion associations and that he has worked with the leading expert, Dr. Icove, in this area.  A copy of Lampkin's CV is included in Appendix A of the Summary Report [Doc. 74].

Although Lampkin is not a structural engineer, the Court finds that he is qualified to render an opinion regarding whether there was a low-order explosion in the Building, which caused low-order damage.  Lampkin is certainly permitted to testify as to his knowledge of low-order

---

[16] As discussed above in section I, Lampkin explained that "low-order damage" was described as "a slow rate of pressure rise or low-force explosion." [Doc. 65-1 at 18].  He continued that the Summary Report, which referenced NFPA 921, used the word "explosion" to describe low-order damage.  [*Id.*].  The Court will use the phrase "low-order explosion" because this is the phrase that Lampkin primarily uses in his testimony.

explosions and the characteristics of such explosions, as these conclusions are based upon a sufficient foundation of experience and knowledge. Particularly relevant to this case, Lampkin has experienced two low-order explosions caused by Coleman fuel during his training. Applying his training and knowledge of low-order explosions to the described circumstances of Plaintiffs' Building observed during the investigation, Lampkin reached his opinion that certain damage to the Building was consistent with a low-order explosion. Specifically, Lampkin testified as follows:

> Okay. The signs of low-order damage that we found in the building were a lower garage door that was buckled outward. There were at least three, if not more, support poles that held the floor system up that were dislodged, mis – they were in a different place. There was a pole that actually had lifted up and had a piece of felt paper laying under it.

> And the front door – at the front door of the building, it had two glass doors, but to the left of those glass doors was a another glass, a large glass window, similar to those behind you, and one corner of it had been dislodged and a piece of clothing from the inside was actually pinched between it and the wall.

> That, with the knowledge of the Coleman fuel and its property and tendency to cause low-order damage when ignited, we believe that that's—that's what we saw that made us—led us to believe that was low-order damage in the building.

[Doc. 65-1 at 21].

The Court finds Lampkin is unquestionably qualified to render his opinions based on his training and experience. Lampkin has been a fire investigator since 1994 for the KCFIU and part of his responsibilities include responding to fires, conducting investigations in their origin and cause, and performing follow-up investigations. He is certified through the National Association of Fire Investigators as a Certified Fire and Explosion Investigator. In addition, he is certified through the International Association of Arson Investigators as a Certified Fire Investigator. [*Id.* at 12]. Here, Lampkin led the investigation and concluded that certain observed conditions in the

Building were consistent with a low-order explosion. Lampkin is offered as a fire and explosion investigator, not a structural engineer. The fact that he may not be familiar with all technical engineering aspects of a building does not make him unqualified to testify regarding observed building conditions that are consistent with low-order explosions. Lampkin established that he had experience with low-order explosions caused by Coleman fuel, the same fuel source identified in this case, and that he was knowledgeable of NFPA 921, which guides the investigation of explosions, including characteristic structural damage to be considered in the investigative analysis of low-order damage. Lampkin's investigation of a possible explosion necessarily required a survey of evidence that would be consistent with such cause, and he was able to explain how the observed conditions in the Building resulted from the force of a low-order explosion. Accordingly, the Court deems Lampkin qualified based on his knowledge of the effects of such explosions on building structures.

Further, Defendant argues that Lampkin did not provide a written report in compliance with Rule 26(a)(2)(B) and that he should be limited to the scope of Plaintiffs' expert designation.[17] Defendant maintains that the word "damages" is not in the designation for Lampkin, and therefore, he should not be allowed to testify as to damages to the Building. While Defendant is correct that the word "damages" is not mentioned in Plaintiffs' designation, the Court notes that Lampkin's disclosure includes references to his observations of conditions in the Building as a basis for his opinion. Specifically, the disclosure states, "In his opinion, there was evidence at the scene of the

_____

[17] The Court observes that Defendant simply states that Lampkin "did not provide a written report in compliance with Rule 26(a)(2)(B)." It is not clear, however, if Lampkin was required to submit the more detailed report under Rule 26(a)(2)(B). *See* Fed. R. Civ. P. 26(a)(2)(B) (discussing disclosure requirements for a witness who is "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony"). Defendant does not explain this argument, and therefore, the Court will not analyze it.

fire that a low-order explosion consistent with a fuel/air explosion in the [B]uilding had occurred."
[Doc. 24 at 1]. In addition, the disclosure discusses evidence that the 2 x 4 wall has been pushed
inward and that the mutual support posts showed evidence of movement. Experience and
knowledge as a fire and explosion investigator may qualify one to deduce the likely cause of an
event based on observation and physical evidence. *See Green v. State Farm Fire and Cas. Co.,*
No. 10-12287, 2011 WL 2412945, at *1 (E.D. Mich. June 14, 2011) (*citing e.g., Bitler, v. A.O.
Smith Corp.,* 391 F.3d 1114, 1125 (1[0]th Cir. 2004) ("Employing his experience and knowledge
as a fire investigator, [the expert] observed the physical evidence at the scene of the accident and
deduced the likely cause of the explosion. Although such a method is not susceptible to testing
or peer review, it does constitute generally acceptable practice as a method for fire investigators
to analyze the cause of fire accidents. . . . Nothing in Rule 702 or *Daubert* requires more.").

Here, the investigation of a low-order explosion under the NFPA necessarily involves the
consideration of whether characteristic damage is observed in an affected structure. Lampkin is
guided by the NFPA in his responsibility of investigating and analyzing fire and explosive
incidents and rendering opinions. As previously stated, Lampkin is permitted to testify about
physical evidence he observed relating to conditions of the Building. While these structural
conditions also may be "damages," simply because Lampkin is not an engineer does not mean he
is unqualified to offer expert opinion about physical observations falling within his area of
expertise as a fire and explosive investigator. The Court notes that while Rule 26(a) seeks to
prevent "ambush at trial" and to "shorten or decrease the need for expert depositions," *R.C.
Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010), "those concerns can
become moot when a deposition is actually taken." *United States v. Roberts*, 830 F. Supp. 2d 372,
387 (M.D. Tenn. 2011) (citing *E.E.O.C. v. Freemen*, 626 F. Supp. 2d 811, 821 (M.D. Tenn. 2009)).

"Moreover, because one purpose of Rule 26(a)(2) is to provide notice, a deposition disclosure may be curative." *Id.* (internal quotation marks and citation omitted); *see also Daniels,* 291 F. Supp. 3d at 846 (stating the same). Here, Lampkin's deposition was actually taken, and Defendant has raised no concern that it will be prejudiced at trial based on an inability to adequately prepare for cross-examination. *See id.* (explaining that the expert's "deposition was actually taken more than three months prior to trial, and defendant "does not argue that it will be prejudiced at trial based on an inability to adequately prepare for cross-examination"). Accordingly, the Court finds Defendant's argument unavailing.

### 2.    Principles and Methods

Defendant objects to the facts and data supporting Lampkin's opinions and his methodology in arriving at his opinion. Specifically, Defendant argues that Lampkin did not determine the pressure caused by the alleged explosion. In addition, Defendant argues that Lampkin's methodology is not relevant or reliable, it is inconsistent with NFPA 921, and it does not satisfy the *Daubert* factors. Finally, Defendant argues that Lampkin's testimony does not fit the facts of this case.

Plaintiffs argue that Lampkin did not think it was necessary to determine the amount of force generated by the explosion and that Lampkin followed the scientific method when conducting his investigation. Plaintiffs state that Defendant does not point to any authority that requires a determination of the pressure or force that was generated by the explosion.

Defendant's primary challenge to Lampkin's opinion is that it is unreliable because he did not determine the amount of pressure generated by the alleged explosion. Specifically, Lampkin testified that he did not know the pressure generated by the low-order explosion. [Doc. 65-1 at 17]. In his deposition, and without the necessity of calculating pressure, Lampkin was able to

testify how the force of an explosion would operate and how the blast pressure would have been reflected by certain conditions. For instance, Lampkin explains that with respect to a low-order explosion, the force would operate in all directions and would operate on the container but not on the light items. [*Id.* at 22-23]. Lampkin stated that the light items were in a "pressurized atmosphere, but there's not going to be any pressure moving on them because they're not containing the actual force." [*Id.* at 23]. Lampkin continued explaining how a low-order explosion affected the structure of the Building and how the force was redirected by certain structures. [*Id.* 23-25, 69]. While Defendant takes particular issue with the fact that Lampkin did not calculate the pressure generated by the low-order explosion or the pressure necessary to move the structures, Lampkin was able to offer testimony as to the explosion pattern and the resulting effects that he determined were consistent with the NFPA's guidance for determining a low-order explosion event. Moreover, Defendant did not identify any citations to NFPA 921 indicating that pressure or force calculations are necessary measures in the investigation of a low-order explosion event. Therefore, the Court finds Defendant's objection to the factual basis of Lampkin's opinion an appropriate subject for cross-examination, but insufficient to exclude his testimony under *Daubert*.

Defendant continues that Lampkin's methodology is simply observing the damage, citing to *Lee v. Andersen*, 616 F.3d 803 (8th Cir. 2010) to support its argument. In *Lee*, the plaintiff filed a claim pursuant to 42 U.S.C. § 1983 over the death of her son. *Id.* at 805. Plaintiff argued that her son did not possess a gun when officers shot him. *Id.* at 807-08. In support of her argument, plaintiff retained an expert who used digital video recording and processing technology to increase the contrast of video images that were captured by a surveillance camera. *Id.* at 808. The expert opined that plaintiff's son did not have a firearm. *Id.* When asked what methods and principles he used to interpret the images, the expert testified that his first method was "simple observation."

*Id.* The court excluded the expert's testimony relating to whether plaintiff's son possessed a gun, explaining that "the jury does not need assistance in determining whether they can see a gun or any other object in the decedent's hand." *Id.* at 805. The Eighth Circuit Court of Appeals affirmed the court's decision, finding that the expert's "opinion would not have assisted the jury but rather would have told it what result to reach." *Id.* at 809.

The facts in *Lee* are distinguishable from the instant matter. In *Lee*, the jury was capable of looking at a video to determine whether the individual possessed a gun—no specialized knowledge was necessary. Here, any evidence of an explosion requires specialized knowledge of which a layperson is unfamiliar. Further, Lampkin testified that his knowledge of Coleman fuel and its property and tendency to cause low-order damages when ignited led him to believe that there was low-order damage to the Building. [Doc. 65-1 at 22]. Contrary to Defendant's assertion, Lampkin's reasoning and ultimate conclusion is not based solely on observations of conditions in the Building, but include facts and data collected during the investigation, his experience and knowledge as a fire and explosion investigator, and his reliance on NFPA 921.

Next, Defendant argues that Lampkin must be disqualified because of various other issues with his methodology. Specifically, Defendant asserts that Lampkin's methodology does not conform to NFPA 921, his methodology does not fit the facts of the case, and his methodology does not satisfy *Daubert* standards.

The parties seem to agree that NFPA 921 is the appropriate standard for reliable principles and methods. Defendant disputes whether Lampkin reliably applied NFPA 921 to the facts of the case. Defendant argues that Lampkin failed to collect data, analyze data, develop a hypothesis, test his hypothesis, and select a final hypothesis.

This Court has already recognized "that NFPA 921 is a peer reviewed and generally accepted standard in the fire investigation community." *Travelers Indem. Co. v. Indus. Paper & Packaging Corp.*, No. CIVA302CV491PHILLIPS, 2006 WL 1788967, at *4 (E.D. Tenn. June 27, 2006) (collecting cases). "Although following NFPA 921 indicates the reliability of an investigator's methods, a departure from the document's guidelines is not necessarily in and of itself grounds for automatic disqualification." *Travelers Cas. Ins. Co. v. Volunteers of Am. Ky., Inc.*, No. 5:10-301-KKC, 2012 WL 3610250, at *3 (E.D. Ky. Aug. 21, 2012) (citing *Thompson v. State Farm Fire and Cas. Co.*, 548 F. Supp. 2d 588, 592 (W.D. Tenn. 2008)).

The 2017 edition of NFPA 921 recommends that fire investigators follow the scientific method in seven steps: (1) recognize the need/identify the problem; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis (inductive reasoning); (6) test the hypothesis (deductive reasoning); and (7) select the final hypothesis. [Doc. 65-2 at 2]. Defendant asserts that Lampkin failed to perform steps three through seven, but the Court finds otherwise.

Defendant argues that Lampkin did not collect "crucial data" and proceeds to list seventeen areas that Lampkin did not analyze. NFPA 921 describes collecting data and analyzing data as follows:

> **Collect Data**: Facts about the fire incident are now collected by observation, experiment, or other direct data-gathering means. The data collected is called empirical data because it is based on observation or experience and is capable of being verified or known to be true.

> **Analyze the Data**: The scientific method requires that all data collected be analyzed. This is an essential step that must take place before the formation of the final hypothesis. The identification, gathering, and cataloging of data does not equate to data analysis. Analysis of the data is based on the knowledge, training, experience, and expertise of the individual doing the analysis. . . . Understanding the meaning of the data will enable the investigator to form hypotheses based on the evidence, rather than on speculation.

[Doc. 65-2 at 3].

Lampkin explained in his deposition that he participated in the investigation as the lead investigator. [Doc. 65-1 at 21]. He inspected the Building, he photographed the scene, he interviewed witnesses, he discussed the Building's condition prior to the accident with the occupants, he discussed the matter with the firefighters at the scene, he made observations to the structure, and he discussed the evidence and his initial thoughts regarding a low-order explosion occurring in the Building with Dr. Icove and Kennamer. [*Id.* at 13, 16-17]. After his investigation, he concluded that the cause of the fire was the ignition of Coleman fuel, which caused a low-order explosion. [*Id.* at 18-19]. Lampkin determined the evidence of a low-order explosion was consistent with a fuel/air explosion visible at the scene. [*Id.* at 27]. He testified that his knowledge of Coleman fuel and its property and tendency to cause low-order damage when ignited led him to believe that low-order damage existed in the Building. [*Id.* at 21].

As previously discussed, experience and knowledge as a fire investigator may qualify one to deduce the likely source of a fire based on observation of physical evidence. *See Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1235 (10th Cir. 2005). In this case, Lampkin explained his data collection and analysis process during his deposition and further supplemented the information with the Summary Report. Defendant's critiques of Lampkin's shortcomings are proper subjects for cross-examination, and the Court finds that "weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993). *See Potts v. Martin & Bayley, Inc*., No. 4:08-CV-00015-JHM, 2011 WL 4703058, at *4 (W.D. Ky. Oct. 4, 2011) (defendant's complaint regarding these allegedly unaccounted for factors goes to the weight of the testimony, not its admissibility); *Spears v. Cooper*, No. 1:07-cv-58, 2008 WL 5552336, at *5 (E.D. Tenn.

Nov. 17, 2008) ("[C]redibility attacks, such as the use of incorrect or incomplete data in formulating an opinion, are intended for cross-examination."); *see also* [Doc. 65-2 at 4] (NFPA 921) ("The evidence that indicates an explosion occurred includes damage or change brought about by blast overpressure as an integral element, producing physical effects on structures, equipment, and other projects."). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 595.

Next, Defendant argues that Lampkin did not develop, test, or select a hypothesis. With respect to developing a hypothesis, NFPA 921 states, "Based on the data analysis, the investigator produces a hypothesis, or hypotheses, to explain the phenomena . . . These hypotheses should be based solely on the empirical data that the investigator has collected through observation and then developed into explanations for the event, which are based upon the investigator's knowledge, training, experience, and expertise." [Doc. 65-2]. As mentioned above, Lampkin testified that his investigation, knowledge, and experience led him to believe an explosion occurred in the Building and that the evidence was consistent with NFPA 921. [Doc. 65-1 at 16-19, 68]. Defendant argues that Lampkin's testimony is unreliable because during his deposition, which was taken almost six years after the 2011 incident, he stated that he could not recall his alternative hypotheses in this case.[18] Lampkin went on to add, however, that he believed he developed other hypotheses because it is standard to do so, and when Defendant specifically questioned him about alternative considerations that might explain some of the conditions of the Building, Lampkin was able provide a response. For instance, Lampkin was asked whether the 2 x 4 wall could have been dislodged by the stream of water from the firehose used to extinguish the fire, and he responded

_____

[18] *See infra* p.10 and note 12.

that "it was very unlikely." [Doc. 65-1 at 90]. Similarly, when asked about the damage to the garage door, he ruled out other considerations, such as damage caused by a vehicle or a crowbar. [*Id.* at 85]. Thus, it is apparent that Lampkin gave consideration to other explanations for conditions that he observed in the Building, and Defendant's arguments suggesting otherwise may be presented to the jury to consider and weigh.

Further, NFPA 921 states, "Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares the hypothesis to all known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident." [Doc. 65-2 at 3]; *see also Volunteers of Am. Ky, Inc.* 2012 WL 3610250, at *4 (finding expert's testimony admissible when he relied on deductive reasoning and concluding defendant's argument that the expert did not properly test his opinions against all of the evidence "bears on the weight" of the opinions, as opposed to their admissibility); *Travelers Indem. Co.*, 2006 WL 1788967, at *4 ("expert testimony has been held to be consistent with NFPA 921 and satisfy *Daubert* without independent testing") (other citations omitted). NFPA 921 continues, "A hypothesis can be tested physically by conducting experiments, analytically by applying accepted scientific principles, or by referring to scientific research." [Doc. 65-2 at 3]. Here, Lampkin offered testimony that given the property of Coleman fuel, it has a tendency to cause low-order damages when ignited and that the evidence he observed and inspected was consistent with NFPA's description of the explosion. [Doc. 65-1 at 21-22, 68]. Lampkin also testified why certain areas and items were not damaged, while other areas and items were damaged. [*Id.* at 73]. In addition, he relied on the occupant's description on the condition of the Building prior to the fire. [*Id.*]. Lampkin concluded that a low-order explosion occurred consistent with Coleman fuel/ambient air reaction and further observed that the damage to the Building was consistent with such an explosion. *See* [Doc. 65-2 at 4] (NFPA

921) ("The evidence that indicates an explosion occurred includes damage or change brought about by blast overpressure as an integral element, producing physical effects on structures, equipment, and other projects.").

Although Defendant criticizes Lampkin's opinion for lack of testing, Defendant has not suggested what tests should have been prepared or what material evidence those tests would have yielded. Moreover, NFPA 921 is a guide defined as "[a] document that is advisory or informative in nature and that contains only nonmandatory provisions." *Thompson,* 548 F. Supp. 2d at 592 (citing NFPA 921 ch. 1.3.69). While following NFPA 921 indicates the reliability of an investigator's methods, any departure from the document's guidelines is not necessarily in and of itself grounds for automatic disqualification. *Id.* Whether any testing would undercut or support Lampkin's conclusion is a matter that goes to the weight of his testimony and is not determinative with respect to the admissibility of his testimony. Expert testimony has been held to be consistent with NFPA 921 and satisfy *Daubert* without independent testing. *See Erie Ins. Co. v. Sunbeam Prod., Inc.*, No. 2:12-CV-00703, 2015 WL 127894, at *7 (S.D. Ohio Jan. 8, 2015) (stating that although the expert "did not perform physical experiments to test his hypothesis, NFPA 921 specifically provides that testing is done by the principle of deductive reasoning"); *Travelers Indem. Co.*, 2006 WL 1788967, at *4 (permitting an expert fire investigator to testify without performing physical testing); *McCoy v. Whirlpool Corp.,* No. Civ.A 02-2064, 2003 WL 1923016, at *3–4 (D. Kan. Apr. 21, 2003) (stating that "independent testing is not the *sine qua non* of admissible under *Daubert*"); *Donegal Mut. Ins. v. White Consolidated Ins.,* 852 N.E.2d 215, 225 (Ohio Ct. App. 2006) (disagreeing with defendant's argument that the expert's lack of testing the hypothesis rendered the opinion inadmissible); *see also Abon, Ltd., v. Transcontinental Ins. Co.*, No. 2004-CA-0029, 2005 WL 1414486, at *10 (Ohio Ct. App. June 16, 2005) (explaining that

"courts have found deductive reasoning and process of elimination to be credible scientific evidence").

Considering the foregoing, the Court is satisfied that Lampkin's testimony is grounded in the generally accepted methodology outlined in NFPA 921, which recognizes a proper role for deductive reasoning, and is more than mere unsupported speculation or subjective belief. Lampkin used reliable principles and methods to form his opinion and applied those principles and methods fairly to the facts of this case. Lampkin's professional experience, combined with his knowledge of Coleman fuel, reliance on NFPA 921, along with his collection and analysis of available data (inspected the Building the night of the fire; interviewed witnesses, including the occupants; discussed the matter with firefighters; confirmed his belief with Dr. Icove and Kennamer; photographed the scene; and observed the damage to the structures) satisfies the Court. Defendant may challenge the degree of credibility the jury ought to accord Lampkin's opinions by presenting counter evidence to refute their veracity.

Defendant also asserts that the term "low-order explosion" is not utilized in NFPA 921 and that Lampkin's use of the term is "another example of a methodological flaw." [Doc. 66 at 15]. As mentioned above, it is not clear if the proper term is "low-order explosion" or "low-force explosion." Lampkin testified that NFPA 921 defines "low-order damage" as "a slow rate of pressure rise or low-force explosion." [Doc. 65-1 at 18]. He stated that NFPA 921 used the word "explosion" to describe "low-order damage." [*Id.*]. Later, during his deposition, Lampkin was asked whether the term "low-order explosion" was used in NFPA 921. [*Id.* at 84]. Lampkin responded that the term was used in an earlier version but that it is not used in the current version. [*Id.*].

Again, it is not clear to the Court whether the correct term is actually "low-force explosion" or whether the term "low-order explosion" was simply used in an earlier edition. If the latter is true, the fact that the 2017 edition of NFPA 921 no longer utilizes this term is not a reason to exclude Lampkin's testimony, given that Lampkin did not have the 2017 edition when he investigated the incident in 2011. If the former is true, the Court finds that this is not a reason to exclude his testimony. This is certainly an area that can be addressed on cross-examination.

Defendant further argues that Lampkin's opinions do not fit the facts of this case. Whether his opinions fit the facts of this case "goes to the question of helpfulness to the trier of fact." *Stoots v. Heckler & Koch, Inc.*, 299 F. Supp. 814, 829 (W.D. Tenn. 2004). As to whether or not a low-order explosion occurred in the Building, there is a connection between the testimony being offered and the issue in this case. The Court finds Lampkin's testimony helpful and that Defendant's concerns regarding the facts can be addressed through vigorous cross-examination. *See id.* ("More importantly, however, that factual weaknesses may eventually be shown in [the expert's] opinions does not require the Court to bar his testimony at this stage. Such concerns go to the weight, not the admissibility, of his testimony."). Defendant is free to conduct a "[v]igorous cross-examination" and/or present evidence to the contrary. *Daubert*, 509 U.S. at 596.

Finally, Defendant argues that Lampkin's methodology does not satisfy the *Daubert* factors. Defendant asserts that Lampkin did not undertake testing in order to attempt to validate his methodology and conclusions; his methodology has not been subject to peer review; his methodology is not supported by peer-reviewed scientific or engineering literature; he did not provide any rate of error; and his methodology is not generally accepted in the scientific community.

As discussed above, Lampkin testified his opinion is consistent with NFPA 921, which both parties acknowledge is the generally accepted standard in the fire and explosion investigation community. NFPA 921 sets forth recommendations and guidelines for investigation, not requirements. Therefore, any deviation from NFPA's guidelines is not dispositive. *Alford v. Allstate Ins. Co.,* No. 12-cv-14238, 2013 WL 12181846 (E.D. Mich. July 8, 2013) (*citing People v. Jackson,* No. 272776, 2008 WL 2037805, at *1 (Mich. Ct. App. May 13, 2008)). While Defendant argues that Lampkin did not conduct any testing, NFPA 921 provides that "[t]esting of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares the hypothesis to all known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident." [Doc. 65-2 at 3]. Further, expert testimony has been held to be consistent with NFPA 921, and satisfy *Daubert,* without independent testing. *See Erie Ins. Co.*, 2015 WL 127894, at *7; *McCoy,* 2003 WL 1923016, at *3. Moreover, Defendant's argument that Lampkin's opinions were not subject to peer review is misplaced.[19] It is not Lampkin's conclusions that have to be peer reviewed, but rather the theories underlying the forensic investigation standards in NFPA 921, which he used to formulate his conclusions. *Erie Ins. Co.*, 2015 WL 127894, at * 7 (*citing Daubert* 509 U.S. at 593); *see also Ky. Farm Bureau Mut. Ins. Co. v. Hitachi Home Elecs.,* No. 3:08-30-DCR, 2009 WL 2589854, at *4 (E.D. Ky. Aug. 20, 2009) ("Thus, these scientific theories underlying the forensic fire investigative techniques [in NFPA 921] have already been tested and deemed reliable."). Lampkin testified about the steps taken in his investigation and the results thereof, and any criticism that his investigation was less than a strictly textbook inquiry goes to the weight of his testimony, and not its admissibility.

---

[19] Specifically, during his deposition, Lampkin was questioned as to whether anyone peer reviewed his opinions in this case. [Doc. 65-1 at 83]. Lampkin testifies, "I believe Mr. Icove has peer reviewed them."

Based on the foregoing, the Court finds that Lampkin's reliance on NFPA 921 and his experience meets the qualification requirements pursuant to Rule 702. The Court finds that Defendant's arguments go towards the weight of the evidence rather than its admissibility. Accordingly, Defendant's *Daubert* Motion in Limine to Exclude the Testimony of Greg Lampkin [**Doc. 65**] is **DENIED**.

**B. Todd Duncan**

Defendant raises two primary challenges to Duncan's testimony. First, Defendant argues that he is not qualified to offer an opinion on whether an explosion occurred in the Building. Second, Defendant asserts that Duncan's methodology is not relevant, reliable, or consistent with the standards under *Daubert*.

The Court will address Defendant's challenges separately.

**1. Qualifications**

Defendant asserts that by his own admission, Duncan is not permitted to offer any expert opinion testimony on whether an explosion occurred in the Building. Defendant emphasizes that Duncan specifically answered, "No," when asked whether he considered himself an expert on explosions. Defendant continues that Duncan does not have the necessary training, education, or experience with respect to explosions.

Plaintiffs submit that Defendant's argument is misplaced. Plaintiffs acknowledge that Duncan is not an expert on explosions. Plaintiffs state that Duncan does not need to be such an expert to know that an explosion occurred or caused damage. Plaintiffs state that Duncan, through his education, training, and experience, is an expert on physical forces and reading evidence caused by such forces.

As mentioned above, Duncan is a professional engineer and is the owner of SEA. [Doc. 58-1 at 6; Doc. 58-7 at 1]. He obtained his Bachelor of Science degree in 1985 in civil engineering, and he majored in structural engineering. [Doc. 58-7 at 6]. He is affiliated with the American Society of Civil Engineers, the Structural Engineering Institute, and the Tennessee Building Officials Association. [*Id.*]. In addition, he is a past board member of the City of Knoxville Building Board of Adjustments and Appeals. [*Id.*] His work involves consultations, where he assesses catastrophic structural damage from EF4 tornados, blasting and explosions, and impact damages from automobiles and trains. [*Id.*]. During his deposition, Duncan testified that with respect to such consultations, they are limited to determining what damage was caused and not what caused the damage. [Doc. 58-1 at 6]. He further testified that he performs forensic investigations for damaged structures. [*Id.*]. When asked whether his work with SEA involves determining whether explosions occurred, he answered, "Just in the sense of looking for evidence that is consistent with an explosion." [*Id.*].

The Court finds Duncan qualified to render his opinions in this case. Duncan is not an expert on explosions, nor does he purport to be an expert on explosions. While Duncan may not render an opinion as to whether an explosion actually occurred, he may offer opinions that the damages in the Building are consistent with the structural damages seen from an explosion. Given his extensive background in engineering, his professional experience of performing forensic investigations, and his experience in looking for evidence consistent with damages from explosions, the Court finds Duncan qualified to render his opinion in this case.

## 2. Principles and Methods

Defendant asserts that Duncan's testimony is neither relevant nor reliable. Defendant's primary challenge to Duncan's testimony is that Duncan did not calculate the pressure generated

by the explosion.  Defendant continues that while pressure is the basis of Duncan's opinion, he failed to quantify the pressure of the explosion.  Defendant maintains that this is fatal to the admissibility of Duncan's opinion.

Plaintiffs argue that it is not necessary to determine the amount of pressure generated by the explosion and that Defendant may cross examine Duncan on this issue.  Plaintiffs argue that Duncan relied on the physical evidence to support his opinion and that he considered many alternatives with respect to the damage before forming his conclusion.  Plaintiffs argue that his opinions are based on a universally-accepted method—that is, NFPA 921—and that he obtained sufficient facts and data to support his opinions.

With respect to calculating the amount of force generated by the explosion, the Court disagrees with Defendant for similar reasons explained above.  Specifically, the Court finds that Defendant may properly cross examine Duncan as to why the pressure was not calculated and that Defendant may present contrary evidence to attack the veracity of Duncan's opinion.  At this point, however, Defendant has not pointed to any authority requiring pressure calculations in the determination of a low-order explosion pursuant to NFPA 921. "Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all the known facts as well as the body of scientific knowledge associated with the phenomenon relevant to the specific incident. A hypothesis can be tested either physically by conducting experiments or analytically by applying scientific principles in 'thought experiment.'" *Dorn v. BMW of N. Am., LLC*, No. 09-1027-WEB, 2010 WL 3913226, at *5 (D. Kan. Sept. 30, 2010) (citing NFPA 921, 4.3.6).  Testing is not a prerequisite to admissibility. *See id.* at *14 (explaining that Rule 702 does not require "actual testing by the expert"); *see also Jacobs v. Tricam Indus., Inc.*, 816 F. Supp. 2d 487, 493 (E.D. Mich. 2011) (explaining that "testing is not required in every

case, particularly where, as here, the expert conducted an examination of the physical evidence")
(citing *Clark v. Chrysler Corp.*, 310 F.3d 461, 467 (6th Cir. 2002) ("*Daubert* does not require an
expert to come in an actually perform tests in any given situation"), *vacated on other grounds*, 540
U.S. 801 (2003)); *Crouch v. John Jewell Aircraft, Inc.*, No. 3:07-CV-638-DJH, 2016 WL 157464,
at *3 (W.D. Ky. Jan. 12, 2016) (stating that while "testing is always desirable, [it] is not a
prerequisite to admissibility") (other citations omitted).

Here, Duncan's testimony is based on a reliable exercise of his engineering expertise and
forensic experience to the available facts. Although Defendant maintains that Duncan's
conclusions have not been validated, citing to Duncan's deposition testimony wherein he testifies
that he cannot one hundred percent confirm that the event generated enough pressure to move the
wall, Rule 702 does not "require anything approaching absolute certainty." *Daniels*, 291 F. Supp.
3d at 840 (quoting *Tamraz,* 620 F.3d at 671–72).

Defendant asserts that Duncan's methodology is unreliable for a number of other reasons.
For instance, Defendant argues that Duncan's first visit to the Building was on February 29, 2012,
which was more than eight months after the fire on June 1, 2011, and that he did not return to the
Building until the summer of 2014. Further, Defendant submits that Duncan did not determine the
condition of the Building prior to the incident and that the damage could be the result of other
causes. Duncan, however, testified that he did consider many other reasons for the damage,
including settlement of the Building. Further, the Court finds such areas are subject to vigorous
cross-examination and presentation of contrary evidence but are not reasons for exclusion. *See*

*Andler,* 670 F.3d at 729 (explaining that weakness in an expert witness's factual basis is not a reason for exclusion).[20]

As part of his investigation, Duncan inspected the Building to determine if the damage was consistent with an explosion, he photographed the damaged structures, he considered alternative theories as to the damages, he reviewed photographs of the Building that were taken prior to the fire, he conducted an elevation survey, and relied upon his professional experience. The Court is satisfied that his testimony meets the *Daubert* principles.

Finally, Defendant argues that Duncan's methodology does not satisfy the *Daubert* factors because Duncan did not test his conclusions, his methodology has not been peer reviewed, he did not determine the rate of error, and his methodology is not generally accepted in the scientific community. Defendant also asserts that Duncan's opinion was developed solely for this litigation.

The Court disagrees that Duncan should be excluded from testifying in this case. Defendant argues that Duncan did not perform a specific test (i.e., determining the pressure generated by the explosion), but Duncan inspected the Building, performed an elevation survey, and testified that he considered all possible causes for the observed damages in the Building. [Doc. 58-1 at 34]. Further, in his expert report, Duncan relies on NFPA 921, a generally accepted source, that characterizes the type of damage that he observed in the Building. [Doc. 58-2 at 7]. The Court also does not find that Duncan developed his opinions solely for this litigation as his work consists of performing consultations with respect to damages observed after explosions. [Doc. 58-1 at 6]. Finally, with respect to the rate of error and whether Duncan's methodology has been peer

---

[20] Defendant also argues that Duncan filed an affidavit, claiming to have personal knowledge that the pressure was caused by an explosion within the structure. [Doc. 59 at 16]. Defendant requests that the Court strike the affidavit pursuant to Rule 56(c)(4). The affidavit [Doc. 33-1], however, was filed in opposition to Defendant's Motion for Summary Judgment, which is not before the undersigned.

reviewed, the Court has considered these factors, but in light of Duncan's professional experience, investigation of the Building, and reliance on NFPA 921, the Court does not find these factors fatal to the admissibility of his opinion. *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 250 F. Supp. 3d 244, 262 (W.D. Ky. 2017) ("Therefore, the lack of peer review or error rates is not fatal."). Accordingly, the Court finds Defendant's Motion in Limine to Exclude the Testimony of Todd Duncan [**Doc. 58**] is **DENIED**.

### C.      Charles Witt

Defendant challenges Witt's testimony because he relied upon Duncan's opinion. Defendant asserts that because Duncan's opinion should be excluded, Witt's opinion should also be excluded. Defendant maintains that should the Court grant its Motion regarding Duncan, there would be no valid basis for Witt's proposed testimony.

As explained above, the Court declines to exclude Duncan's testimony in this case. Accordingly, the Court finds no basis to exclude Witt from testifying as to the costs of repairs, and therefore, Defendant's Motion in Limine to Exclude the Testimony of Charles Witt [**Doc. 60**] is **DENIED.**

### D.      Maurice Mallia and Mary French-Ewers

As mentioned previously, Defendant's Motion challenges Mallia's and French-Ewer's qualifications and their methodology. In response, Plaintiffs state that Defendant's Motion should be rendered moot because they do not intend to rely on Mallia's and French-Ewer's opinions at trial. In its Reply, Defendant asserts that Plaintiffs did not object to the Motion, meaning that all the reasons set forth for exclusion of the witnesses are undisputed.

During the hearing in this matter, Defendant maintained that its Motion should be granted. For grounds, Defendant argued that it believed Duncan relied on Mallia and French-Ewers's

report, but it would need to confirm.[21]  Plaintiffs stated that it is unfair to deem Mallia and French-Ewers unqualified to render an opinion in this matter, given that Plaintiffs do not intend to rely on their testimony.  Subsequently, after the hearing in this matter, Defendant filed a Supplemental Brief [Doc. 84], stating that Plaintiffs filed an exhibit list that indicated that they may use the "reports, drawings, tables, photos, and exhibits to reports prepared by Mary French-Ewers" and the "reports, drawings, tables, photos, and exhibits to reports prepared by Maurice Mallia."  [Doc. 84 at 1] (citing [Doc. 81 at ¶¶ 18-19]).  The Court ordered [Doc. 85] Plaintiffs to respond to Defendant's Supplemental Brief, given that Plaintiffs' exhibit list was contrary to the representations made to the Court at the May 10 hearing.

Plaintiffs filed a Reply to Defendant's Supplemental Brief, stating as follows: "Plaintiffs have no intention on using Maurice Mallia or Mary French-Ewers as experts.  Plaintiffs have no intention of using the reports, drawings, or calculations contained in their reports.  This writer made that representation to the court at the oral argument on the *Daubert* motions and it remains true." [Doc. 86 at 1].  Plaintiffs explain that they named Mallia and French-Ewers on their exhibit list under the heading "if needed" in the event Defendant uses the witnesses' information.  Plaintiffs continue that they did not want to be barred from using these same reports on cross-examination because, at the hearing, Defendant would not agree to restrict these witnesses for both parties.

Although Defendant insists that the expert witnesses should be excluded based on their qualifications and methodology, the Court finds no reason to make such findings, given Plaintiffs' representations to the Court that they will not utilize any information provided by Mallia and

---

[21] Upon the Court's review of Duncan's deposition testimony and his report, it does not appear that Duncan relied on Mallia and French-Ewers's opinions in forming his own conclusions.

French-Ewers in this case. The purpose of Defendant's Motion is to exclude these witnesses at trial—Plaintiffs have agreed not to use them. Accordingly, the Court finds Defendant's Motion in Limine to Exclude the Testimony of Maurice Mallia and Mary French-Ewers [**Doc. 62**] **DENIED AS MOOT**.

## IV.     CONCLUSION

Accordingly, for the reasons set forth above, the Court finds as follows:

1. Defendant's Motion in Limine to Exclude the Testimony of Todd Duncan [**Doc. 58**] is **DENIED**;

2. Defendant's Motion in Limine to Exclude the Testimony of Charles Witt [**Doc. 60**] is **DENIED**;

3. Defendant's Motion in Limine to Exclude the Testimony of Maurice Mallia and Mary French-Ewers [**Doc. 62**] is **DENIED AS MOOT**; and

4. Defendant's Motion in Limine to Exclude the Testimony of Greg Lampkin [**Doc. 65**] is **DENIED**.


**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge